Case, Baran v. Medical Device Technology, No. 2010-1058. And we'll hear from Mr. Alva. Is that the pronunciation of your name? That's correct, Your Honor. Alva. Very good. Good afternoon. May it please the Court? My argument today will address errors in the claim construction order and the summary judgment order issued by the Court below. I'd first like to start with the 797 patent and specifically the charging member limitation. That's one of two constructions that are challenged. We're asking that the constructions be modified and that the summary judgment order be vacated, the order of non-infringement. The District Court framed the dispute around the charging member limitation as follows. The dispute in this case is whether the safety cap or other structure that is used to move the device into the charged position can be described as a mechanism. The District Court was focused on the wrong thing, the preferred embodiment, rather than the claim language. The Court recognized that the charging member limitation encompasses multiple component structures that move, but incorrectly concluded that the charging member limitation could not encompass a mechanism or, in the District Court's parlance, a multi-component structure moving in series. Okay. So your argument with respect to this limitation in the claim is that she misconstrued member and that member should have been construed to include a multi-component system or mechanism? Well, below the argument was over the scope of the entire limitation. Member was certainly part of that. There wasn't an isolated focus on what member meant. It was what the entire limitation meant. And our argument was that the entire limitation encompassed a charging mechanism. And she said no. And she said no. And she relied on the CCS Fitness case for the proposition that member could not encompass a mechanism or, again in her terms, a multi-component structure that moved in series. But there's nothing in the CCS Fitness case that supports that. It's frankly the opposite. She turned it on its head. CCS Fitness case involved what the defendant charged was a complex mechanism in a piece of fitness equipment. And we set that out in our brief at 41 and 42 and show what the features are. It's essentially a four-bar linkage used to crank a piece of fitness equipment. The defendant made the point that CCS Fitness, as I recall, is that this is distinguishable because here the component parts of the slider crank mechanism do not act in unison. So that was the distinction she drew, right? Well, she said that in the CCS Fitness case that the movement was in unison. Right. And here it is not. And here it is not. But what I'm saying is that distinction doesn't stand up to the specific mechanism that was charged as an infringement in CCS Fitness. It was a mechanism. That's what the defendant referred to it as in its own brief, saying, you know, making the same argument that Empty Tech is making in this case. Well, it seems to me the problem you may have is that, I mean, the terms here are read in the context of this claim. So irrespective of what CCS Fitness says, we're looking at this claim. Absolutely. So the question is, why is she wrong in construing member to not include mechanism? Well, why she's wrong is she's looking at the preferred embodiment. And she's saying, well, in the preferred embodiment, what charges the mechanism is one piece. It's one component. But there's nothing, there's no disavowal of what the scope of member is. Again, it's agreed that it's a multi-component structure. There's no disavowal of a mechanism. Wait, what did you say? It's agreed that it's a multi-component structure? Yes, it's a multi-component structure that both sides understand the scope of member to include a multi-component structure that moves. It's just a matter of how it moves. That's the dispute, whether it moves in unison or it moves in series. We say it can move in series. It can operate as a mechanism. The defendant says it cannot. But there's no, nothing in the specification that supports such a restriction. The only thing that does is the preferred embodiment. That's what the district court relied on in addition to an improper reading of a CCS Fitness case. We had offered an alternative construction in our brief at 46 that would recognize a multi-component structure as equivalent to a member. The only other issue it seems is whether there needs to be direct action of the member on the guide to move it. That issue really didn't come up until summary judgment. We had argued that even though we lost the claim construction issue, we could still prove infringement because we could establish that what was referred to as the cocking arm that charged the device could be used to charge the device. It didn't act directly on the guide to charge the device, but the language is not written, the claim language is not written in a way that requires direct action. All the claim language requires is that you have a manually operable charging member that performs a function of what? Moving the guide to the charged position. And that's what we said. Is your understanding of the use of the word direct, I mean it could be kind of two slightly different things. Does direct mean, in your view, the way it was used by the district court, that it has to move the guide by itself, or does it mean that it has to be at the end of the line of other moving parts? I guess I didn't distinguish between the two, but I think it's, I read it more as the former. But it has to move it by itself. It has to move it by itself. But in all cases, there's no, the language of the claim, this is yet another importation of the claim, the claim language doesn't say a charging, manually operable charging member contacting the guide for moving the guide or to move the guide. It doesn't say that. Well, it says for moving the guide, which suggests, I mean, if we disagree with you that member can encompass numerous components, if you think that member is just one component, then it says for moving the guide. It's not a leap, I don't think, to say that it does this function directly, in other words, itself. Is it? Well, it's, the case law suggests that language like this is not so limiting. It doesn't, in other words, it doesn't limit it to, it looks, it's in a sense like means plus function language, except it's not a means plus function clause. Yeah, and you didn't raise equivalence, and I guess you don't get statutory equivalence under this. That's right, that's right. Do you, are you in effect saying that the word member, as used in this claim, really ought to be understood as being equivalent to the word means without the baggage of 112.6? In a sense, yes. I mean, that is to say, put another way, you're really saying that member means any mechanical device or collection of devices that have this effect, right? Well, I don't know, what would be a means that would fall outside of the scope of member? Can you give me an example of something that, if you had a Rube Goldberg sort of elaborate sequence of parts, would that all be a single member if, when you pulled on the first part, it had the effect of charging the device? I'm not going to go that far. I'm not going to go that far. Well, it would help me if you would try, because we're importantly here, with respect to this limitation at least, we are sort of in that position of trying to decide where's the limit of member and where's the beginning of mechanism that's not a member. So unless you're prepared to say, and I think you've just said that you're not, unless you're prepared to say that all devices that have the effect of charging this piece of equipment are a member, then we need to draw a line between those devices that are a member and those that are not. And I want to know where you would draw that line. You have to draw it somewhere. Well, I'm comfortable if you draw the line as the court did in the CCS fitness case. It said really the same four-bar linkage. It's essentially a four-bar linkage. It falls within the scope of a reciprocating member. That's what the court said in the CCS fitness. We're going no further than that. So you want us to write an opinion that says we have no idea what the difference between a member and a mechanism is in the abstract, but whatever the difference is, this was a member. That's right. I mean, we're asking you to make a narrow decision, not make a broad proclamation as to what a member is. Okay. But you're almost reaching the point where you're asking us to say that it's a means for charging. Is that almost like a means plus function type of a construction? No, I'm not asking for that because that's much more limiting, and that's not the way the claim was drafted. It was not drafted as a means plus function. Well, it's a structural claim. It's a structure. But you're saying it's a charging member being more than one piece. In this case, yes, it has more than one piece, and the defendant in the case, Eppley, has no problem with it being a multiple-piece structure. Even if you're right about member, you still have the release means for retaining the guide and the charged position issue to deal with. Yes. Now, let's assume for a moment with me, I know you don't agree with this, but let's assume that we interpret that to include two functions, the release function and the retaining function. Now, what's your argument as to why the district court was wrong in her analysis of the non-equivalence of structure for purposes of that means plus function clause? Well, first of all, as you know, it's a structural comparison. Of course. To the specifications, recitation, corresponding structure for the functions, the two functions. That's right. And it's not component by component. You're looking at the overall structure, and that's a fact question that's submitted to the jury. Well, it may or may not be, depending on whether it's a fact question on which juries could disagree. Right. Fair enough. Where the court erred in its analysis of that aspect of the appeal is there's clear support in the specification for the corresponding structure. In this case, the release lever. Okay. It's the release lever. That corresponding structure is flexibly secured or welded to the seat 38 of the outer casing and released upon pressing. Where are you reading from the spec? I'm sorry. This is A 9394, column 5, lines 8 through 10, column 6, 25 through 32, and 61 through 68. Now, let's make sure we're in the right patent. You're in the 797 now? 797. Okay. Yeah. Okay. And did you find that? Yes. Okay. It goes on to say that the specification says the material construction has natural resilience. This is on A94, column 7, lines 53 and 54. So the concept here is that in the corresponding structure and in the accused structure, there's flexing that's going on. Dr. Haga talked about that in his report and in his deposition, A310, A326 through 327, A194 through 196. When you say flexing, my understanding was that the patented device uses what the trial judge called the lever, which triggers by pulling up the tab. Here's the tab. Here's the lever. And the device, when you push here, comes up here, the tab comes out, and the gun shoots. That isn't reliance on flexibility of this device. In fact, flexibility would make that work more poorly, whereas in what you allege to be the corresponding device, which is the tab that is illustrated, I think, best on page 35 of the red brief, there's a black tab that comes up in the middle of the green crank arm. That's what I understand you to be saying is the equivalent structure. There, flexibility is essential because you would have to pry the little tab away from the lip that is holding the crank arm down, and then the crank arm releases. So it seems to me you were talking about two rather different structures there. Well, it's interesting. It's a very good question. What the district court relied on for its analysis of the corresponding structure was not the specification. It was actually in characterizing it as a true classic lever. It relied on a turning argument of the defendant. You'll look in vain for any analysis on the part of the expert or defendant that characterizes the corresponding structure, the release lever, as a classic lever operating in the way that it is described. She classified it as a cantilever. No, that's the other definition. That's the accused version. You're confused about it. Yeah, the corresponding structure, in fact, and this isn't in the record, and so I'm reluctant to mention it, but what the defendant's expert said is the corresponding structure in the patent was not operational. So he never analyzed it as a true lever. So the court accepted the argument of the attorney that it represented a true lever without the proof to support it. So that's where the court went awry with this fallacy of characterizing the corresponding structure as a lever and then saying, well, that's very different than a cantilever. Well, I guess I read her analysis somewhat differently, and that is that, I mean, I know there's a lot going on here. You had an argument over function, an argument over structure, an argument over way, and the argument over result. I thought she focused more on there was an equivalency here. I don't know if you conceded that or not. So she was looking for whether or not the cantilever operated substantially the same way with substantially the same result. That's how I understood her analysis. Do you agree with that? No. We argued that there was equivalence, not structural identity, but equivalent in way and result by reference to the flexing of what in both cases were referred to as release levers. There's, again, a debate about whether it's a lever or not, but what's clear, undisputed, is that there's flexing that goes on in each, in both the corresponding structure and in the accused device. And where's the reference in the patent, again, to the flexing of the release lever? Absolutely. It's in column six. I'll start there. It is about line 29. Mounting section 98 is formed with a latching projection 102. At one end of the release lever, it is flexibly secured to the outer casing by a spot weld. Which enables it. That's the fulcrum, the spot weld, right? Well, no. Isn't that 104? That's the point at which this lever pops up and down. Right. Well, I think you're assuming that it acts as a fulcrum. Well, I'm concluding that it does. Yeah, okay. You're concluding that it does. Because the picture here makes that, it seems to me, almost ineluctable. I cannot understand how the device releases upon pressure on the finger end and raising of the little tab in response to that pressure, unless the thing is operating as a lever, around 104 as a fulcrum. Well, there is a lever. Am I correct in that that's the basic way it works? There is. Let me start with the problem. I'm sorry. Is that how it works? That's the way it's designed to work. Okay. What's missing is that it's not a classic lever, in the sense that you're assuming that the fulcrum is a rigid structure. In other words, that lever sits across that fulcrum. There's no give, if you will, in the fulcrum, where, in fact, what the patent teaches is there's flexibility of that, if you want to call it a fulcrum, a spot weld that allows some play. It doesn't act like a . . . Well, if there was a weld, the thing wouldn't move at all. You could push with . . . True. If it were really welded, you could push with all your might, and you'd never get that little tab up. So the flexibility, it seems to me, has to mean that it allows this kind of motion. But if that's different from this kind of flexibility, it seems to me, which would be self-defeating . . . I mean, if you had a very weak piece of plastic here that would simply bend upon finger pressure, you'd never get the tab out. This thing would never fire, right? Yes. As I said, I think you have to have some ability to . . . some leverage. Okay. I'm not saying that. But our case doesn't rest on there being some difference between the way that the device is activated. We're saying that it's an equivalent way, and there's support for that. Do I have any time to address this 798? Well, I think . . . why don't you give us a minute or two on the 798, simply because it's a major part of the case. We've asked you a lot of questions. We'll allow the other side some extra time as well. Okay. With respect to the 798 . . . Try to boil it down to the essence. I will, Your Honor. Thank you. The 798 is a CIP, not a divisional application of the 797. It has new . . . the new disclosure is to a sealed chamber means, which is covered in both Claims 9 and Claim 18. We're seeking modification. The principal argument is that without loss or damage limitation that's contained in all three limitations in question. The starting point for the without loss or damage is in select dictionary definitions and in looking at structures other than . . . and I'm speaking specifically about the detachable stylet limitation. The district court looked at structures other than the stylet and the cannula to determine what detachable meant with respect to the stylet and the cannula. But the relationship between the stylet and the cannula is a sliding relationship. It's described that way throughout the patent. There's not a joinder of the stylet and the cannula that then get . . . they're separated during operation. Rather, it's a sliding relationship. The only place where detachability shows up in describing the stylet and the cannula is in the summary, and that summary is directed to both embodiments. The court did not give weight to that and did not give weight to dictionary definitions, other broader dictionary definitions of detachable that don't include the without loss or damage limitation. Just to illustrate the problem with the court's analysis is think about a single-use water bottle, a Dasani bottle of water that you get out of a vending machine. It has a cap on top. That cap is sealed by virtue of a ring around with caps. You twist the top off. You break that seal. We think, well, I've just detached the cap from the bottle. Under the court's definition, that is not a detachable because there's damage that's caused. Since you've raised an example, let me give you a counterexample and see what your response is. No doubt you know what the typical little tire gauge is, the pencil-shaped tire gauge that has a device that comes out, slides in and out, and shows you whether you're having tire pressure or not. We know that the two portions of that tire gauge move with respect to one another, but, of course, when you reach the end of the run of the gauge, it stops and you can't take them apart. Now, you could break it. Would you call those two components of the tire gauge detachable in that you could break the gauge and detach the one part from the other? Well, I'm assuming they're not designed to come out. No, they're not. The typical design, as far as I know, universal, is they're not designed to come apart. But you can take them apart if you're willing to put up with the consequences that you will have a one-use tire gauge. Well, I think it goes to the point that I would make, is that detachment is context-specific. You have to look at the specific context and decide, is it detachable? It's a relative term. We deal with a lot of relative terms, like rigid is an example that came up in this case. I asked the opposing side's expert, what does rigid mean? He said, well, everything is non-rigid to some extent. So, again, it's one of these things. It's context-driven as to whether it's. Okay, I think we've probably gone well enough over time that I think we have the full scope of the case. Let's hear from Ms. Thompson. Thank you. Good afternoon, Your Honors. I'll give you some extra time if you need it. I hope I don't. My name is Monica Thompson, and together with Mr. Hines from DLA Piper, we represent MD Tech. And seated also at council table is David McMasters, who is the general counsel for Angiotech, the owner of MD Tech. I'm going to start where we left off with the 798. And I believe this argument is very simple. It is simply that detachable and releasable, as used in the 798 patent claim to, does not mean break apart. Because if that were the case, anything, you rob these words of content, because anything can be broken apart. Just with Your Honors' example of the tire gauge, you can break it and you can call that detachable. There isn't anything that these words would denote. Well, how about the argument that the stylet is not attached to, in the sense of fixedly attached to, the cannula, in that it can move with respect to the cannula? Well, first of all, within the same claim, that slidable relationship is already expressed by an earlier limitation. It says that the stylet is slidably received within the cannula. So you would be duplicating that limitation with that interpretation. Secondly, contrary to what counsel has pointed to, the specifications between the 798 and the 797 patent didn't change. There are two embodiments. And we have admitted to the Court that the claim to the 798 really reads on the reusable embodiment. And within that reusable embodiment, there is a description that should you choose to change needles or stylets within the needle structure, you can take them out. That's why you don't glue or adhere the base of the stylet to the device. It fits within a close. It can be pulled out. The whole thing can be taken out. You can choose to put in a new needle set. Or you can take the entire stylet out and replace it. And there is a description within the specification that this could be desirable because some needles are just like straight needles. They're like a wire sharpened at the end. And some have small notches cut into them, which helps sometimes in the retention of a specimen. So I take it that you're pointing to, oh, let's see, this is figure two, I guess, of both patents. The threads that are both on device, well, they're pointed to as 74 and 56, I guess, of the two sets of threads. On which you screw in the top of the, I don't know the name of the device, but the one that holds the cannula is screwed to the cannula mount. Well, that follows. And you screw that onto the stylet mount. It's to the guide, which is used for biasing. And you can take those apart so that that's your understanding of what detachable means here. That is described as releasable in the 298. Both the first connector and the second connector being releasably and fixably attachable to the mount. What the detachable goes to is that imposed within the cannula, there would be a stylet already. And the stylet, to be able to be used in this embodiment, you would see in the figure you were just looking at, figure one, if you go to the illustration slightly above that shows where the spring is, there is a long post. And it's denoted as number 46. That's a little clevis that you can stick the end of the stylet into. Right. But if you couldn't screw the cannula one into the other, you couldn't get the stylet out, right? That's correct. So it has the consequence of both affecting the detachable and also the releasable limitations. Correct. You can also pull out the stylet, I take it, from the whole device by pulling it out of the clevis. Only if you're using the releasable device. Right, but not on the single-use device. Right. The single-use device, this is all glued in and there would be no way to detach anything. But within that, in the clear languages, in the frequent use of detachable and releasable, I'm sorry, detachable within the specifications point to the interpretation that was given by the district court below. Unless there is really any other question. What claim of the patent, the 798 patent, would read on the single-use embodiment? Number 18. 18, okay. So there is a, there are, it is covered within there. All right. But as counsel noted, that is a continuation of part that really brought in this reverse suction to help retain them. But that's irrelevant. To our analysis it is. So with that, I'd like to move on then to the 797, the two issues in there. And starting with the releasable means for retaining the guide in a charged position. On that, you could help me out. Let's assume that we follow what the district court did and said until we get to the point of the equivalence argument. So let's assume we're dealing with the functions right. And it seems to me that the difficulty I'm having is that whether something operates in substantially the same way and with substantially the same result seems a very highly factual inquiry. And so in the summary judgment context, it seems a little difficult to accept the result here given the factual inquiry. How, why is that not a fair assessment of where we are in this case? Because this case, the facts of this case make it so intellectually different in the way that the two are designed to do. Let's start with the fact that in trying to find an equivalent structure to do this, Barron's counsel has had to focus on the cantilever, which has really nothing to do in the ordinary operation of that device. It has nothing to do with the release of the guides for purposes of taking a biopsy. It is a device that holds the cocking mechanism down and together until a biopsy is taken by depressing the release. So you hit the button, you don't pry open the tip. No, in fact, even the expert for Dr. Barron agreed it would be very poor judgment to try to take a biopsy by prying it open because it's a very violent discharge. It does not concentrate the force on the guides. It doesn't even get the cannulas to work. Well, that may not be the preferred way of doing it. In fact, it may not be. Nobody outside of this demonstration in court may have ever done it that way. But it nonetheless does have the effect of retaining the guide in the charged position as long as it's in place. And then when it's taken out of place, it releases it. So why isn't that a release means for retaining? And that was the district court's finding. I have obviously argued that I understand that just because it's not the instructed method of using the device, that it still could possibly be an infringing use. But I've never come across any decision from this court that something that could potentially be a dangerous use should be considered as an infringing use simply because it's the only structure within our- But if it's properly done, it wouldn't be a dangerous use, would it? If it's properly done? I think the answer to that is in the video of Dr. Rashidi demonstrating it. It is a somewhat violent discharge, and you're dealing with an instrument that by that time has already had biomedical- it's already been into the patient, it's got a sharpened edge, and you could- it's difficult to control. It's difficult to pull the handle apart from the device at that time. Well, from the exhibits that were submitted to the court, at least, there is a section where the particular item 49 on figure 7- Within the patent, Your Honor? No, it's one of your exhibits. End of your question, sir? With respect to 49, what the lower court did find when she made the equivalence test was that 49 acted as a cantilever, not as a lever. Now, if you take a cantilever and you hold that lever up vertically, wouldn't it actually be acting as a lever by itself, a release lever? That's what 49 actually does. Actually, no, it does not. I mean, a lever has two sides. One is where the force of work is applied, the other is the one that does the work, and you have a fulcrum that it pivots around. With the cantilever, there is no way that I have any way to apply force to that particular device, even when it's cocked down. If you have it like this and it pivots, it's a vertical lever, and once it's cocked, it's back. If it's released, it goes back straight. Why wouldn't that be the same function? Because in this device, it is straight at all times. Well, no, it bends because we've seen the exhibits, and when you cock it, it bends over. Well, now, when you're bringing the crank arm down, I assume that this device, which looks like this, the crank arm comes down, there's a hole in it, and I assume that this little lip flips under this, there's some bending back, as Judge Garrison says, and then the lip comes over the crank arm, right? And now you're secure. So it does bend back, it has to, in order to accommodate the hole in the crank arm. You're absolutely correct. So why isn't it acting like a lever at that point? Because the force is not generated on the other side of a fulcrum around a pivot point. Where the force is coming from is the stationary portion you're flicking or you're flexing back. It is the actual demonstration that Judge Bryson gave with a pen or a pencil that you can flip or flex in order to get it to change positions enough to allow the tab to engage the cocking arm. So the idea is if this were made out of metal, a good solid chunk of steel, that you'd never be able, not only would you not be able to uncock it, you wouldn't ever be able to cock it. Possibly not. Because you couldn't, unless they were given in the crank arms section. Correct. There would be no flexibility at all at that point if it's made out of metal. Correct. But the patented device, you want it to be non-flexible because if it's made out of metal, it serves as a trigger just fine. Absolutely. But it can be made out of a flexible device in the patented device. But it better not be too flexible or it will never pull the little tab out of the hole. Well, you can still have some flexibility there. It doesn't have to be metal. It doesn't have to be rigid in that regard. In the patented device, that's true. But I agree again with Judge Bryson. It absolutely has to have a certain degree of rigidity or the downward force that's put on the tab will never release. But you have a lever which, under the trigger situation in 797, figure 4, if you press that lever, you would release it, right? Correct. So it doesn't have to be metal or stiff. It has to be somewhat flexible too. But it can be flexible. It can be flexible to a point. It cannot be so flexible that by the time you achieve putting the force on that thumb rest and reach the body of the instrument, you have to have enough rigidity that it would cause the tab end to pull up. If it doesn't pull up, you don't have a release. Well, you would have the same type of rigidity in the number 49 level when you press it down and that one presses back because it can't be that rigid. It isn't constructed that rigidly. But it could be because it doesn't matter whether that flexes or whether the crank arm itself flexes, so let's say the lip gives in order to fall underneath the lip on the flex arm. Well, the flex arm does have some flexibility to itself when it presses down, and there's a notch in there which catches the trigger point.  And that trigger point can be flexible, and it is flexible under the items that were submitted to the court, the exhibits. It can be made of a flexible material. It can also be made of a non-flexible material because the arm itself has enough give. If you can bow the crank arm, if necessary, you can bow it, and it would shorten that pull and pull the tab out. But it still bends. So that acts like a release and a rigid construction. And the claim, the way it was interpreted, would mean that a release means for retaining and releasing, right? So it has two functions. I cannot, I've already disagreed with the district court, but I believe she found that it performs the release and the retention function because she read it to go as far as the spring got. The rest of the equivalence argument is where she said, I think quite literally, Barron's arguments fall off the typewire because it is not the same way. It is not the same. It is the difference between a dagger or a seesaw. You're using the wrong standard. It's not the same way. It's substantially equivalent. And it is still not in a substantially equivalent way because, as in the analogy that the district court gave, it was the difference between a seesaw and a diving board. And then she also focused on the results and said it was not substantially the same results. Every discharge, every release that's described anywhere in this patent is sufficient to take a biopsy. There is no release that you can achieve by pulling up the crank arm that would allow you to take a biopsy, and Barron's own expert agreed with us on that point. The issue is it doesn't achieve the same results and therefore it wouldn't reach the equivalency test. But doesn't it achieve the same result? Isn't that really a jury question at that point, a factual determination as to whether or not it achieves the same result? I believe that in this case, given this specification in the context of this patent, if a jury reached that result, I would get a directed verdict on it. There is no support for finding any other... There's no description anywhere in the specifications of a release for any purpose other than taking a discharge. I'm sorry, taking a biopsy. There's nothing for safety. There's no other imagined use of discharging this device. And you would not have, as the claim language begins with, you wouldn't have a biopsy instrument unless you can take a biopsy. There would be no biopsy that would be achievable if it only operate either the invention or my client's device by discharges that were insufficient for biopsy purposes. So I think that within the context of this patent, no, this does not raise a substantial issue of material fact. I'll move on to the member argument with respect to the 797 patent. And I believe that, you know, there was, first of all, I think there was some misdirection in counsel's argument. I don't believe that the judge relied on CCS. I think it was brought to her attention by counsel as trying to explain... We understand how CCS relates to this case, so that... If I don't need to explain any further, I would also point out that CCS didn't deal with trying to distinguish mechanism from member. The district court in the summary judgment analysis did take all the definitions of member and mechanism and conclude that there is a difference between the two. If it's not working in unison, whether it's multi-part or not, if it's not working in unison, it's a mechanism. And practitioners, even Barron's own expert, Dr. Hager, understood that it's a mechanism. He called the member simply the crank arm. And he said the crank arm worked through the mechanism, which was the rest of the crank arm mechanism. So it's a clear understanding of these parts. If you explode member, you so subsume everything. You have no definition. You have no limitation. And it wouldn't be supported by anything in the specification or enablement. I see my time is up. Well, you actually have not used quite as much time as your opposing counsel. If you had a final thought you wish to share with us, you may. I believe that I did want to be very clear about the mechanism in the bioprints, the crank arm mechanism. It is a serial device. It does not all work in unison. As you pull up on the crank arm, it's described very much in detail in the machinist's report. It has to reach a point at the apex where it clicks into the crank before it can pull down. Then the parts move together. So I think it supports the district court's analysis. And it also supports what I believe is court found in CCS. It's not against CCS. It's just saying in these two contexts, that's how the determination would be. I really think that the district court was correct on all of her claim constructions with the exception of one. We pointed that out in our brief with respect to the mounts. I believe that argument is so simple and we covered it in our briefs. I don't have anything more to add to it. But other than that, I think everything that the district court said with claim construction and on summary judgment should be affirmed and the judgment below should be affirmed. Thank you. Thank you. Thank both counsel. Oh, I'm sorry. You have some rebuttal. I'll be brief. Good. Claim 18 of the 798, counsel said that that claim covered the single-use embodiment. Under the district court's construction of connector, which requires the connector be releasable. This is the first connector limitation. It requires that the connector be releasable. That construction would read out the single-use embodiment, which I'll note, too, that claim 18 adds this sealed chamber as an element that was the basis of filing the continuation and part application. So that's clearly a disfavored construction. As to 797, the thing I'll address is, with respect to way, the queue structure has what's referred to as a snap latch. Now, this is addressed in some detail in Dr. Barron's declaration. It was excluded. But he describes in his declaration in some detail the functionality of a snap latch. This is A352, and specifically paragraph 60, how a snap latch operates, that it bends and then recovers to engage. And that is based on, in part, reading of the patent that covers the queue structure. As to result, there's no requirement in the claim to perform a biopsy. There's been a lot of discussion by counsel that we can't use this method of releasing to perform a biopsy. Performing a biopsy is not a limitation of the claim. This is not a method claim. And the title of the patent is automated biopsy instrument? I'm not suggesting that performing a biopsy is irrelevant to the use of the device. I'm simply referring to what's claimed subject matter. As to the bad judgment in performing a biopsy that way, I'll just note, it seems like a picky point, but that was asked of our expert in operating a device, a redesigned version of the accused product, that the redesign made it more difficult to lift up on the handle. You'll see if you look at the testimony that he had two versions of the accused product. The first one, it was very easy to lift up on the handle. And the second one, he struggled to lift up on the handle. So I wanted to make sure that the record is clear on that point. The other thing is... What happens after the device is discharged? Suppose it's a multi-use device. Do you then, this is the accused device now, do you then re-cock it by raising the handle and lowering it again? Yeah, you perform a biopsy. Right, yeah, I understand. Then you have to lift up on the handle, recharge it to get the sample, the specimen. All right, so you do have to release the cock arm, the crank arm I guess it's called, in the course of... Yes. All right. And you have to reload it. And the point about discharging it again, you're done performing biopsies, you're an interventional radiologist, you put the device down, I don't have to perform any more biopsies. Well, I've got a loaded gun there, okay? That's a reason for lifting up on the handle to discharge the device without a fire. But you also have to recharge it and discharge it in order to get the sample out of the frame. That's right, that's right. And after that... Once it's discharged, you don't need to recharge it again at that point, do you? No, but after you perform your last biopsy, you're done with it, it's still loaded, okay? You could fire it in one of two ways. But not if you take the sample out. You don't want to leave the sample in the canyon. No, you've already gotten the sample out, but you just have still a loaded device. That's another reason for discharging the device other than performing biopsies. Thank you. Thank you. Case is submitted. All rise. The Honorable Court is adjourned until tomorrow morning at 10 a.m.